1

2

3

4

5

6

7

8                   **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  DAVID ALLEN HIGHFILL,               Case No. EDCV 14-0734 (SS)

12                  Plaintiff,

13        v.                           **MEMORANDUM DECISION AND ORDER**

14  CAROLYN W. COLVIN, Acting
    Commissioner of Social
15  Security,

16                  Defendant.

17

18

19

20                              **I.**

21                         **INTRODUCTION**

22

23      David Allen Highfill ("Plaintiff") seeks review of the final

24  decision   of   the   Commissioner   of   the   Social   Security

25  Administration ("the Commissioner") denying his application for

26  Supplemental Security Income ("SSI").

27  \\

28  \\

The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on June 30, 2010. (Administrative Record ("AR") 15, 189). Plaintiff alleged disability beginning on June 29, 2005, due to major depressive disorder, chronic headaches, and a heart impairment. (AR 129). Plaintiff's application was initially denied on April 6, 2011 (AR 70-73), and denied on reconsideration on August 4, 2011 (AR 75-79). Plaintiff requested a hearing on August 17, 2011. (AR 82). A hearing was held before Administrative Law Judge ("ALJ") Joseph D. Schloss on August 20, 2012 ("ALJ hearing"). (AR 29). Plaintiff was represented by counsel. (Id.). Plaintiff testified at the hearing, as did Vocational Expert ("VE") Abbe May and Medical Expert ("ME") Dr. David Jarmon. (AR 29-52). The ALJ issued an unfavorable decision on August 29, 2012, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 15-24). Plaintiff requested review of the ALJ's decision October 17, 2012, which the Appeals Council denied on February 20, 2014. (AR 1-6). As a result, the ALJ's decision became the final decision of the Commissioner. Plaintiff filed the instant complaint on April 22, 2014.

### III.

### FACTUAL BACKGROUND

Plaintiff was born on August 28, 1965. (AR 125). He was thirty-nine years old on June 29, 2005, his alleged disability onset date (see AR 23) and forty-six years old on the date of the ALJ hearing (see generally AR 29, 36). Plaintiff was released from prison on September 16, 2010 (AR 428) and was discharged from parole on October 16, 2011. (AR 422). Plaintiff told an examining psychologist that he had been arrested more than ten times and convicted seven times for assault and battery, inflicting bodily injury, driving with a suspended license, driving under the influence and possession of firearms. (AR 222). Plaintiff also admitted to alcohol and street drug use, including the use of "speed" for over twenty years. (Id.). He has been sober for the last nine years. (AR 44, 222). Plaintiff last worked in 2001.[1] (AR 38). Prior to becoming unable to work, his primary employment experience was as a plumber's assistant. (AR 130). He has completed the twelfth grade. (Id.). In his SSI application, Plaintiff alleged that he suffered from depression, chronic headaches, and a heart impairment. (AR 129).

---

[1] Plaintiff testified at the ALJ hearing that he believed that he last worked in 2001, but he was uncertain of this. (AR 38). Plaintiff's Disability Report indicates that Plaintiff stopped working in 2005 because he had fallen off a ladder. (AR 129). However, Plaintiff testified at the ALJ hearing that he fell off a ladder in 1996 or 1997. (AR 40). Ultimately, after his fall in the late nineties, he tried for several years to return to plumbing, but the work became increasingly more difficult for him to do. (Id.).

1  **A.   <u>Plaintiff's Medical History</u>**

2

3     **1.   Treating Physicians**

4

5     On December 22, 2009, Dr. Joseph Davis at Arrowhead Regional

6  Medical Center ("ARMC") performed surgery on Plaintiff to remove

7  his gallbladder.  (AR 405-08).  On or around July 29, 2011,

8  Plaintiff was treated at ARMC by Dr. Linna Kho for chronic

9  diarrhea (AR 369-70) and tested for colitis and Crohn's disease

10  per the direction of Dr. Bruce Sabha. (AR 380).  On April 16,

11  2012, Dr. Andrew Song conducted an MRI scan of Plaintiff's left

12  knee at the Center.  (AR 365).  The MRI showed an intact

13  reconstructed anterior cruciate ligament, tears of the medial and

14  lateral menisci and moderate-sized joint effusion in the left

15  knee.  (<u>Id.</u>).  Plaintiff had previously had knee surgery at

16  Arrowhead Regional in 1996.  (<u>Id.</u>).

17

18     Plaintiff also received treatment at the Department of

19  Corrections Parole Outpatient Clinic ("POC") from April 12, 2010,

20  until August 8, 2011.[2]  (AR 422-36).  On September 17, 2010,

21  Plaintiff saw Carolyn Riordan, a licensed clinical social worker,

22  for an Initial Mental Health Evaluation.  (AR 200-202, 429).  On

23  September 27, 2010, Plaintiff was seen by POC psychiatrist Robert

24  T. Allen.  (AR 428).  At that time, Plaintiff reported that he

25  had begun to feel depressed about seven years earlier and that he

26

27  [2] The record indicates that Plaintiff's clinic intake date was
    April 12, 2010.  (AR 422).  However, the records provided begin
28  on September 17, 2010.  (<u>See</u> AR 429).

felt depressed most of the time, although sometimes he experienced a normal mood. (AR 428). Dr. Allen wrote that it "[s]ounds like [Plaintiff] goes from depressed mood to euthymia." (Id.). Plaintiff also reported hearing voices, especially when he was depressed. (Id.). In her evaluation, Riordan diagnosed Plaintiff with polysubstance abuse, major depressive disorder, single episode, severe with mood-congruent delusions and schizoaffective disorder, depressive type. (AR 201). Riordan also assessed Plaintiff with a Global Assessment of Functioning ("GAF") score of sixty. (AR 202).[3] Plaintiff was prescribed Seroquel and Wellbutrin in September 2010 (AR 203), and at times during his treatment, he was prescribed Abilify, Effexor and Remeron (AR 422-24).[4] On March 14, 2011, Plaintiff told Dr. Allen that he felt "pretty good" since beginning treatment and that he only suffered auditory hallucinations "[a] little bit one day." (AR 425). However, on July 11, 2011, Plaintiff reported that he "still hear[d] [his] name being called." (AR 423). On August 8, 2011, Plaintiff said that Abilify was "working OK" for his voices. (AR 422). Plaintiff consistently reported that he took his medications daily. (AR 422-36). Plaintiff was

---

[3] A GAF score between fifty-one and sixty indicates that the individual has moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school function (e.g., few friends, conflicts with peers or coworkers). American Psychiatric Association, Diagnostic and Statistical Manual of Social Disorders, 34 (4th ed. text rev. 2000).
[4] Seroquel and Abilify are used to the treat the symptoms of schizophrenia, and Wellbutrin, Effexor and Remeron are used to treat depression. See MEDLINEPLUS, http://nlm.nih.gov/medlineplus/druginformation.html (search by drug name) (last visited July 8, 2015).

1  discharged from parole on October 16, 2011 and ended treatment at

2  POC.  (AR 422).

3

4      **2.   Examining Physicians**

5

6      Dr.  Banafshe  Ardebili,  a  state  agency  examining

7  psychologist, conducted a Complete Mental Evaluation of Plaintiff

8  on February 21, 2011 at MSLA – Palm Springs.  (AR 220-26).  She

9  assessed Plaintiff with a GAF score of fifty-eight.  (AR 224).

10  Dr. Ardebili found that Plaintiff was able to understand and

11  carry out short, simple instructions and perform basic self-care

12  skills, including preparing simple meals and managing his own

13  funds.  (AR 225).  She determined that Plaintiff was able to make

14  simple work-related decisions without additional supervision,

15  maintain attention and concentration, maintain persistence and

16  maintain day-to-day activities.  (Id.).  However, she found that

17  Plaintiff had a mild inability to understand and carry out

18  detailed instructions, to accept instructions from supervisors

19  and to maintain pace.  (Id.).  Dr. Ardebili also found that

20  Plaintiff had a moderate inability to interact appropriately with

21  supervisors, coworkers and peers.  (Id.).  She opined that

22  "[Plaintiff] would optimally thrive in a supervised, structured

23  environment," and that medication compliance was "crucial" for

24  Plaintiff to manage his symptoms.  (Id.).

25

26      Dr.  Sohail  Afra,  a  state  agency  examining  internist,

27  performed a Complete Internal Medicine Evaluation of Plaintiff on

28  February 7, 2011 at MSLA – Palm Springs.  (AR 215-19).  Dr. Afra

6

1  found that Plaintiff had hypertension, latent tuberculosis, and a

2  significant psychiatric history.    (AR 219).    However, he

3  concluded that Plaintiff had no functional restrictions.  (<u>Id.</u>).

4

5       **3.   Consulting Physicians**

6

7       Dr. Andres Kerns, a non-examining consulting psychologist,

8  completed a Mental Residual Functional Capacity Assessment of

9  Plaintiff on April 1, 2011.  (AR 232-35).  Dr. Kerns found that

10  Plaintiff was able to meet the basic mental and emotional

11  requirements of competitive, remunerative, unskilled work and

12  that he would be able to understand, carry out and remember

13  simple instructions, make simple work-related decisions, respond

14  appropriately to supervision, co-workers and work situations, and

15  deal with changes in a routine work setting on a sustained basis.

16  (AR 234).  He also opined that Plaintiff would "do best" in a job

17  requiring minimal social interaction.  (<u>Id.</u>).

18

19       Dr. J. Frankel, a non-examining consulting physician,

20  completed a Physical Residual Functional Capacity Assessment of

21  Plaintiff on March 25, 2011.  (AR 227-31).  Dr. Frankel diagnosed

22  Plaintiff with latent tuberculosis.   (AR 227).   He found that

23  Plaintiff had no functional restrictions (AR 228-30), but that he

24  should avoid concentrated exposure to extreme cold and heat,

25  wetness, humidity, fumes, odors, dusts, gases, poor ventilation

26  and hazards because of his latent tuberculosis.  (AR 230).

27  //

28  //

**B.   <u>Medical Expert Testimony</u>**

Medical Expert David Jarmon testified at the ALJ hearing regarding Plaintiff's mental health history. (AR 31-36). Dr. Jarmon stated that Plaintiff had been diagnosed with bipolar disorder, but noted that Plaintiff's symptoms were well-managed when he took medication. (AR 33). Dr. Jarmon also testified that although Plaintiff had been diagnosed with schizoaffective disorder on September 27, 2010,[5] there was only "slim" objective medical evidence to support this finding. (AR 33-34). He described the evidence as "slim" because the diagnosis was based on Plaintiff's subjective complaints of auditory hallucinations when he did not take medication. (AR 34). Though Dr. Ardebili had rated Plaintiff at fifty-eight on the GAF scale, Dr. Jarmon stated that there was insufficient evidence for this score when Plaintiff was evaluated. (AR 35-36). He opined that Plaintiff's GAF score did not suggest the presence of severe mental illness. (AR 36).

At the hearing, Dr. Jarmon also pointed out that the record did not show evidence of psychosis, despite Dr. Ardebili's diagnosis, and found that Dr. Ardebili's record did not indicate the severity of Plaintiff's depression. (AR 35-36). Dr. Jarmon noted that when Plaintiff was compliant with his medication, he was moderately limited in activities of daily living, mildly

_____

[5] Although Dr. Jarmon testified that Plaintiff was diagnosed on September 27, 2010 (AR 33), according to the record, the diagnosis was actually made on September 17, 2010 by licensed clinical social worker Carolyn Riordan at the POC (AR 201).

1   limited in social functioning and moderately limited in

2   concentration and pace. (AR 34). He also noted that Plaintiff

3   had not had any episodes of decompensation with the medication,

4   and that the record showed no evidence that Plaintiff had abused

5   drugs after his alleged disability onset date. (Id.).

6

7   **C.   Vocational Expert Testimony**

8

9   Vocational Expert ("VE") Abbe May identified Plaintiff's

10   past relevant work in the Dictionary of Occupational Titles

11   ("DOT") as a plumber's assistant. (AR 47). According to the VE,

12   this was semi-skilled work requiring vocational preparation level

13   four and performed at a heavy level of exertion. (AR 47-48).

14

15   The ALJ posed two hypotheticals to the VE. In the first

16   hypothetical, the ALJ asked if a forty-seven year old individual

17   with a high school education and the same past relevant work as

18   Plaintiff, who had no exertional limitations but should not be

19   exposed to extreme cold, heat, wetness, humidity, fumes, dust,

20   odors, gases or poor ventilation would be able to perform the

21   plumber's job. (AR 48). Ultimately, it was determined that such

22   an individual would not be able to perform Plaintiff's past

23   relevant work. (AR 48-49). However, the hypothetical individual

24   would be capable of other jobs such as a hand packager and

25   laundry worker. (AR 49-50).

26

27   In the second hypothetical, the ALJ asked whether the same

28   individual could perform these alternative jobs if he were

limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, could occasionally push, pull and kneel with the left lower extremity and had no limitations on the right, could not crawl, work with ladders, ropes or scaffolds or work at unprotected heights, and could not have public contact or perform team-oriented tasks.[6]  (AR 50-51).  The VE testified that the individual would be able to perform the job of a laundry worker, collator or mail sorter but not the job of a hand packager.  (See AR 50-51).

D.  **Plaintiff's Hearing Testimony**

Plaintiff testified at the ALJ hearing that he had supported himself with general relief and food stamps for the past two years.  (AR 36-37).  He also stated that he had lived alone in a trailer without water or electrical power since his release from prison in September 2010.  (AR 37-38).  During the day, Plaintiff read occasionally but did not watch television or listen to radio.  (AR 46).  Plaintiff prepared his own meals and testified that he mainly ate "tortillas and peanut butter."  (AR 46-47).  Plaintiff admitted that he had been arrested ten times and convicted at least seven times.  (See AR 38).  Plaintiff admitted that he had been diagnosed with polysubstance abuse in September 2010 (AR 34), but stated that had not consumed alcohol in the

---

[6]  At the ALJ hearing, the ALJ first said that the hypothetical individual would have limitations on the right knee and no limitations on the left knee.  (AR 50).  The ALJ corrected the hypothetical to reflect limitations on Plaintiff's use of the left knee.  (AR 51).

1    past twelve years and had not used methamphetamine in the past

2    nine years. (AR 44).

3

4        Plaintiff testified that it was very difficult for him to

5    work or to exercise, and that he had gained about forty pounds in

6    the previous two years. (AR 38-39). He also "stay[ed] in bed a

7    lot." (Id.). He did not work because he "just [couldn't]

8    function anymore," and "[it was] hard . . . to get places on

9    time." (AR 39). Tasks that previously took two hours now took

10   "days" to finish, and Plaintiff did not "function in society very

11   much anymore." (AR 39-40). He also stated that he had not

12   applied for a job in the previous two years. (AR 47).

13

14       Plaintiff testified that he wore a knee brace on his left

15   knee because he fell off a ladder in 1996 or 1997. (AR 40). The

16   injury had required surgery. (Id.). He had chronic knee pain

17   after the fall and wore a custom knee brace. (AR 40-41). He had

18   purchased a new knee brace a month before the hearing. (AR 41).

19   Plaintiff experienced chronic pain in his left shoulder due to a

20   self-inflicted gunshot wound from a 2009 suicide attempt. (AR

21   41-42). He had not made any other suicide attempts. (AR 42).

22   Plaintiff testified that his shoulder often felt numb and that he

23   experienced pain when he raised his left elbow above the shoulder

24   level. (Id.). Although Plaintiff was hospitalized after he shot

25   himself in 2009, he had not been hospitalized for mental health

26   reasons since filing the disability claim. (AR 43).

27   //

28   //

Plaintiff testified that he suffered from back pain and headaches. (AR 43). He added that he had a "really bad migraine" "[a]t least every two weeks for about three days." (Id.). He took prescription Ibuprofen to treat the migraines, and also took Codeine to treat his knee pain. (Id.). Plaintiff took Seroquel and Wellbutrin as prescribed because "[He didn't] want to kill [himself] anymore." (Id.).

Plaintiff testified that his mental health problems were more debilitating than his physical issues. (AR 44). Even a trip to the supermarket was overwhelming because "there's just too many things going on." (Id.). He had no friends and opined that he was difficult to get along with. (AR 44-45). He lived near his mother, but they did not socialize often. (AR 46). When the ALJ asked if Plaintiff had any additional mental health symptoms, Plaintiff testified that he had auditory and visual hallucinations and heard voices weekly. (AR 45-46).

**E.   Plaintiff's Function Report**

Plaintiff completed a Function Report in conjunction with his application on October 11, 2010. (AR 138-47). He reported that he lived in a trailer without power or water. (AR 140). He went into town to shop for food and water daily, but had trouble with personal care and needed his mother's help to get places. (AR 140-42). He needed "hours" to wash three pairs of socks and two pairs of shorts. (AR 142). He reported that he "[didn't] like people" and was unable to keep a job. (AR 143, 145). He

also used a brace on his knee sometimes and always wore glasses. (AR 146).   In answering the question "How well do you follow written instructions?" Plaintiff stated, "You tell me."   (AR 145).[7]

## F.   Third Party Function Report

Plaintiff's mother, Frances Douglas, completed a Third Party Function Report on October 12, 2010.   (AR 150-58).   She described Plaintiff as "in pain, can't work, sleeps 12 [hours] a day, moody and antisocial."  (AR 151).   He also had anxiety and was unable to sleep.  (AR 152).   After Plaintiff ceased being able to work, he became more depressed and "[did] less."  (AR 155).   She also described Plaintiff as "suicidal" and "more remote" since he stopped working.  (AR 155-56).   Plaintiff also needed reminders to change his clothes and put on a coat.  (AR 153).

Ms. Douglas stated that Plaintiff had trouble getting along with other people because "people [didn't] like him" and because of his bipolar disorder.  (AR 156-57).   She also suggested that Plaintiff's bipolar disorder prevented him from keeping a job. (AR 157).   Plaintiff "stay[ed] away if possible" from authority figures, and he did not handle stress or changes in routine well. (Id.).

---

[7]  The Function Report also contained gratuitous profanity, and many questions were left unanswered or were answered incompletely.  (See generally AR 140-47).

1    She reported that Plaintiff took his medication, filled out
2    "this kind of paperwork," and took sleeping pills every day.  (AR
3    151).  He ate junk food and could not cook.  (AR 153).  Ms.
4    Douglas also verified that Plaintiff wore a brace on his left
5    knee that had been prescribed to him in 1996 and that he wore
6    glasses every day.  (AR 157).

7

8                                 **IV.**
9               **THE FIVE STEP SEQUENTIAL EVALUATION PROCESS**

10

11   To qualify for disability benefits, a claimant must
12   demonstrate a medically determinable physical or mental
13   impairment that prevents him from engaging in substantial gainful
14   activity and that is expected to result in death or to last for a
15   continuous period of at least twelve months.  Reddick v. Chater,
16   157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. §
17   423(d)(1)(A).  The impairment must render the claimant incapable
18   of performing the work he previously performed and incapable of
19   performing any other substantial gainful employment that exists
20   in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098
21   (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

22

23   To decide if a claimant is disabled and therefore entitled
24   to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§
25   404.1520, 416.920.  The steps are:
26   //
27   //
28   //

(1)   Is the claimant presently engaged in substantial
gainful activity?  If so, the claimant is found
not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the
claimant is found not disabled.  If so, proceed
to step three.

(3)   Does the claimant's impairment meet or equal one
on the list of specific impairments described in
20 C.F.R. Part 404, Subpart P, Appendix 1?  If
so, the claimant is found disabled.  If not,
proceed to step four.

(4)   Is the claimant capable of performing his past
work?  If so, the claimant is found not disabled.
If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If
not, the claimant is found disabled.  If so, the
claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R.
§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

The claimant has the burden of proof at steps one through
four and the Commissioner has the burden of proof at step five.
Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an
affirmative duty to assist the claimant in developing the record
at every step of the inquiry.  Id. at 954.  If, at step four, the
claimant meets his burden of establishing an inability to perform

past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity, age, education, and work experience. Tackett, 180 F.3d at 1100; see Reddick, 157 F.3d at 721; see also 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

### THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (See AR 15-17).

At step one, the ALJ found that Plaintiff had not been engaged in substantial gainful employment since his alleged disability onset date of June 30, 2010. (AR 17).

//

//

At step two, the ALJ found that Plaintiff had the severe impairments of headaches, essential hypertension, latent pulmonary tuberculosis, meniscal tears in the left knee and polysubstance abuse. (AR 17). Although Plaintiff also alleged having a heart impairment implant, the ALJ found no objective medical evidence that a heart implant had been installed. (Id.).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1525, 414.1526, 416.920(d), 416.925, 416.926). (AR 17-19). The severity of Plaintiff's mental impairments did not meet or medically equal the criteria of listings 12.03, 12.04, 12.08 or 12.09.[8]   (AR 18).   The ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of extended decompensation, and therefore the "paragraph B" criteria were not satisfied. (Id.).   The ALJ also found that the evidence did not establish the presence of the "paragraph C" criteria. (AR 19). The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b), including:

---

[8]   Listing 12.03 covers schizophrenic, paranoid and other psychotic disorders; listing 12.04 covers affective disorders; listing 12.08 covers personality disorders; and listing 12.09 covers substance addiction disorders.   20 C.F.R. Part 404, Subpart P, Appendix 1.

lifting and carrying 20 pounds occasionally and 10
pounds frequently; occasional pushing and pulling with
the left lower extremity and occasional kneeling with
the left lower extremity with no limits on the right
lower extremity; and no crawling, climbing ladders,
ropes or scaffolds; or working at unprotected heights.
[Plaintiff] is limited to a non public environment
with no team oriented tasks, or requiring hyper
vigilance.

(AR 19). In reaching this opinion, the ALJ specified that he had considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p. (Id.). The ALJ also stated that he considered opinion evidence in his finding, in accordance with the requirements of 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (Id.).

In assessing Plaintiff's credibility, the ALJ followed a two-step process in which he first determined whether there was an underlying medically determinable physical or mental impairment(s) that could have reasonably been expected to produce the Plaintiff's pain or other symptoms. (AR 19-20). Then, after the underlying impairment(s) had been shown, he evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited Plaintiff's functioning. (AR 19-22). Ultimately, the ALJ found

that Plaintiff's medically determinable impairments could have reasonably been expected to have caused the alleged symptoms. (AR 20).  However, the ALJ also found that Plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were incompatible with Plaintiff's RFC.  (Id.).

The ALJ questioned Plaintiff's testimony and subjective complaints and found inconsistencies that diminished his overall credibility.  (AR 19-22).  The ALJ noted that when Plaintiff saw Dr. Afra, the state agency examining physician, he said that his main complaints were hypertension and headaches.  (AR 21).  However, Plaintiff alleged knee, shoulder and back pain.  (AR 21-22).  The ALJ also opined that Plaintiff provided inconsistent statements regarding his daily activities.  (AR 22).  For example, the ALJ remarked that Plaintiff told Dr. Ardebili, the examining psychologist, that he did household chores, made simple meals, shopped and walked his dog.  (Id.; see AR 222).  However, at the hearing, the ALJ observed that Plaintiff "portray[ed] himself . . . as being unable to do anything except stay inside his trailer."  (AR 22; see generally AR 39-40, 45-47).  The ALJ also noted that despite Plaintiff's allegations of inactivity, he exhibited no muscle dystrophy and had gained only eleven pounds between February 2011 and the ALJ hearing in August 2012.  (AR 22).  The ALJ further opined that Plaintiff had not received the medical treatment that would have been expected for a totally disabled individual.  (Id.).  Although Plaintiff's mother corroborated Plaintiff's representations in a third party

function report, the ALJ did not give her statement significant weight because it was inconsistent with objective findings in the medical record. (AR 22).

The ALJ also reviewed the specific findings of Plaintiff's physicians and questioned the objective medical evidence. The ALJ noted that Dr. Frankel, the non-examining consulting physician, assessed limitations due to latent tuberculosis that exceeded Plaintiff's own complaints. (AR 20-21). The ALJ also noted that Dr. Afra, the state agency examining physician, assessed Plaintiff with no functional restrictions despite an MRI of Plaintiff's left knee from April 16, 2012, showing an intact reconstructed anterior cruciate ligament, tears of the medial and lateral menisci and joint effusion. (AR 20). The ALJ gave minimal weight to the opinions of Drs. Frankel and Afra in order to give great consideration to Plaintiff's allegations that he had functional restrictions beyond those assessed by Drs. Frankel and Afra. (AR 21). The ALJ found that the opinions of Drs. Ardebili and Kerns, who had assessed Plaintiff's mental health, to be consistent with Plaintiff's description of his difficulties with dealing with others and consistent with the medical record as a whole. (Id.).

At step four, the ALJ found that Plaintiff was unable to perform his past relevant work as a plumber's assistant. (AR 23). However, at step five, the ALJ found that, considering Plaintiff's age, education, work experience and RFC, he could perform jobs that exist in significant numbers in the national

1   economy.   (AR 23).   The ALJ found that Plaintiff could perform

2   other jobs such as laundry worker, collator or mail sorter.   (AR

3   24).   Accordingly, the ALJ found that Plaintiff was not disabled

4   within the meaning of the Social Security Act.   (Id.).

**VI.**

**STANDARD OF REVIEW**

9        Under 42 U.S.C. § 405(g), a district court may review the

10  Commissioner's decision to deny benefits.   "[The] court may set

11  aside the Commissioner's denial of benefits when the ALJ's

12  findings are based on legal error or are not supported by

13  substantial evidence in the record as a whole."   Auckland v.

14  Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett,

15  180 F. 3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th

16  Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir.

17  1989)).

19        "Substantial evidence is more than a scintilla, but less

20  than a preponderance."   Reddick, 157 F.3d at 720 (citing Jamerson

21  v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).   It is "relevant

22  evidence which a reasonable person might accept as adequate to

23  support a conclusion."   Id. (citing Jamerson, 112 F.3d at 1066;

24  Smolen, 80 F.3d at 1279).   To determine whether substantial

25  evidence supports a finding, the court must "'consider the record

26  as a whole, weighing both evidence that supports and evidence

27  that detracts from the [Commissioner's] conclusion.'"   Auckland,

28  257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

21

Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff contends that the ALJ improperly rejected the opinion of examining psychologist Banafshe Ardebili in assessing Plaintiff's residual functional capacity and thus propounded an incomplete hypothetical to the vocational expert that did not take all of Plaintiff's limitations into consideration. (Memorandum in Support of Complaint ("MSC"), Dkt. No. 18, at 3-5). The Court disagrees.

**A. The ALJ Properly Weighed The Opinion Of Examining Psychologist Ardebili**

The Ninth Circuit recognizes three types of physicians: (1) treating physicians who examine and treat, (2) examining physicians who examine but do not treat, and (3) non-examining physicians who neither examine nor treat. Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009). Generally, the opinion of a treating physician is given greater weight than the opinion of a non-treating physician, and the opinion of an examining physician is given greater weight than the opinion of a

1  non-examining physician.  *Garrison v. Colvin*, 759 F.3d 995, 1012

2  (9th Cir. 2014) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d

3  1194 (9th Cir. 2008)); *Lester v. Chater*, 81 F.3d 821, 830 (9th

4  Cir. 1995).  Accordingly, where the treating or examining

5  physician's opinion is contradicted by another doctor, the ALJ

6  may only reject it by providing specific and legitimate reasons

7  supported by substantial evidence in the record.  *Id.*; *see Orn v.*

8  *Astrue*, 495 F.3d 625, 633 (9th Cir. 2007).  However, treating and

9  examining physicians' opinions are not given more weight if they

10  are conclusory or are not supported by the medical evidence.  *See*

11  *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir.

12  2004).

13

14    Plaintiff contends that the ALJ improperly rejected Dr.

15  Ardebili's medical opinion because he did not provide specific

16  and legitimate reasons for rejecting part of her opinion.  (MSC

17  at 4-5).  Plaintiff contends that the ALJ implicitly rejected Dr.

18  Ardebili's opinion because the ALJ did not adopt the assessment

19  that Plaintiff needed to work in a "supervised, structured

20  environment" in the RFC.  (MSC at 5).

21

22    After taking a medical history and performing an examination

23  of Plaintiff, Dr. Ardebili completed a Functional Assessment in a

24  report prepared for the Commissioner.  (AR 220-26).  In her

25  assessment, Dr. Ardebili identified Plaintiff's specific

26  functional limitations.  (AR 225).  She found that Plaintiff had

27  a moderate inability to interact appropriately with supervisors,

28  coworkers and peers and that he had a mild inability to

23

understand and carry out detailed instructions, to accept instructions from supervisors and to maintain pace. (AR 225). Dr. Ardebili opined that Plaintiff could understand and carry out short, simple instructions, perform basic self-care skills, perform simple work-related decisions with additional supervision, maintain attention and concentration, and maintain persistence and day-to-day activities. (Id.).

In her assessment, Dr. Ardebili also included the opinion that Plaintiff "would optimally thrive in a supervised, structured environment." (Id.). Given the explicit limitations that Dr. Ardebili assessed for Plaintiff, the plain language of her statement shows that Dr. Ardebili was proposing an ideal work environment, not assessing a limitation. (See id.).

The ALJ gave Dr. Ardebili's opinion great weight and found "the opinion[] to be consistent with the record as a whole." (AR 21). The ALJ assessed Plaintiff with the RFC to perform light work and appropriately factored Dr. Ardebili's limitations into Plaintiff's RFC. (Compare AR 19, with AR 224-25; see AR 22). Dr. Ardebili opined that Plaintiff had a moderate inability to interact with supervisors, coworkers and peers. (AR 225). These findings are consistent with the residual functional capacity adopted by the ALJ, who opined that Plaintiff was limited to working in a "non public environment with no team oriented tasks, or requiring hyper vigilance." (AR 19).

//

//

24

1    Furthermore, the ALJ specifically considered Dr. Ardebili's
2    opinions on Plaintiff's limitations and incorporated her
3    limitations in Plaintiff's RFC:

4

5        The findings on the mental status examination of Dr.
6        Ardebili and other treatment records indicate that the
7        claimant is able to maintain concentration,
8        persistence and attention as would allow the
9        completion of a regular workday with acceptable pace
10       and attendance.  Hence, the mental disorders are
11       addressed by limiting, but not totally precluding,
12       functioning in the workplace as represented by the
13       residual functional capacity which limits the claimant
14       to non public, non team oriented tasks not requiring
15       hypervigilance.

16

17   (AR 22).  Contrary to Plaintiff's contention, the ALJ did not
18   reject Dr. Ardebili's findings.  (Compare AR 19, with AR 224-25;
19   see AR 22).  The ALJ gave Dr. Ardebili's opinion great weight and
20   incorporated her opinion into Plaintiff's RFC accordingly.  (AR
21   22).  Therefore, the ALJ properly weighed the opinion of
22   examining psychologist Ardebili.

23

24   **B.   <u>The ALJ Propounded A Complete Hypothetical To The Vocational</u>**
25       **<u>Expert</u>**

26

27       Under the five-step evaluation process, if a claimant shows
28   that he cannot return to his or her previous job, the burden

shifts to the Commissioner to show that the claimant can do other work. _Garrison_, 759 F.3d at 1011 (quoting _Embrey v. Bowen_, 849 F.2d 418, 422 (9th Cir. 1988)).   In order to show that the claimant can do other work, the ALJ may call upon a vocational expert to testify as to what jobs the claimant would be able to perform, given his or her RFC, and the availability of those jobs in the national economy.   _Tackett_, 180 F.3d at 1101.   When a claimant has both exertional and nonexertional limitations, the ALJ must take the testimony of a vocational expert.   _Moore_, 216 F.3d at 869 (citing _Burkhart_, 856 F.2d at 1340).   At the hearing, the ALJ may pose hypothetical questions to the vocational expert about the claimant's ability to work considering all of the claimant's impairments.   _Garrison_, 759 F.3d at 1011 (citing _Gamer v. Sec. of Health & Human Servs._, 815 F.2d 1275, 1279 (9th Cir. 1987), _superseded by statute_, Social Security Disability Benefits Reform Act of 1984, Pub. L. No. 98-460, 98 Stat. 1794 (codified as amended at 42 U.S.C. § 423(d)(5)(A) (1988))).   "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."   _Tackett_, 180 F.3d at 1101 (citation omitted).   The assumptions in the hypothetical presented to the VE must be supported by the record because "[t]he testimony of a [VE] is valuable only to the extent that it is supported by medical evidence."   _Garrison_, 759 F.3d at 1011 (quoting _Magallanes v. Bowen_, 881 F.2d 747, 756 (9th Cir. 1989) (citations omitted)).   The VE then testifies about what kinds of jobs Plaintiff can perform, given the hypothetical, and whether there are a sufficient number of these jobs available to support a finding of "not disabled."   _Tackett_, 180 F.3d at 1101.

1     Here, the ALJ posed two complete hypotheticals to the VE in
2  which the depiction of Plaintiff's disability was accurate,
3  detailed and supported by the medical record. (AR 47-51). In
4  the first hypothetical, the ALJ asked whether an individual who
5  was the same age and had the same educational background and work
6  experience as Plaintiff and had no exertional limitations, but
7  should not be exposed to extreme cold, heat, wetness, humidity,
8  fumes, dust, odors, gases or poor ventilation, would be able to
9  perform the plumber's job. (AR 48). The VE testified that such
10 a hypothetical individual could not perform the job of a plumber,
11 but could be employed as a hand packager or laundry worker. (AR
12 48-50). In the second hypothetical, the ALJ asked whether the
13 hypothetical individual could perform either of those jobs if he
14 or she could only lift and carry twenty pounds occasionally and
15 ten pounds frequently, could occasionally push, pull and kneel
16 with the left lower extremity and had no limitations on the
17 right, could not crawl, work with ladders, ropes or scaffolds, or
18 work at unprotected heights, and could not have public contact or
19 perform team-oriented tasks. (AR 50-51). The VE testified that
20 the hypothetical individual could perform the job of a laundry
21 worker, collator and mail sorter. (Id.).

22

23     The hypotheticals that the ALJ posed are supported by the
24 medical record. In the first hypothetical, the ALJ incorporated
25 the environmental limitations that Dr. Frankel suggested after he
26 examined Plaintiff and diagnosed him with latent tuberculosis.
27 (Compare AR 48, with AR 230). In the second hypothetical, the
28 ALJ incorporated exertional limitations that are supported by

1  medical records from the Arrowhead Regional Medical Center and an
2  MRI of Plaintiff's left knee.   (Compare AR 50, with AR 365, 469-
3  74, 479-508, 510-64).    Plaintiff contends that the ALJ posed
4  incomplete hypotheticals to the VE because the ALJ did not ask
5  the VE to assume a hypothetical individual who required a
6  "supervised, structured environment."    (MSC at 5). However,
7  assumptions in a hypothetical presented to the VE must be
8  supported by medical evidence.    See Magallanes, 881 F.2d at 756.
9  Here, there is no medical evidence that Plaintiff was limited to
10 work only in a "supervised, structured environment."   Although
11 Dr. Ardebili opined that Plaintiff would "optimally thrive in a
12 supervised, structured environment," she did not limit him to
13 work solely in such an environment.   (AR 225).   Therefore, the
14 ALJ propounded complete hypotheticals to the VE that were
15 accurate, detailed and supported by the medical record.

16

17     Where an ALJ properly weighs the opinions of a claimant's
18 physicians and arrives at a proper RFC, the court must uphold the
19 ALJ's decision.   See Molina v. Astrue, 674 F.3d 1104, 1110-1111
20 (9th Cir. 2012).   Even if the evidence is susceptible to multiple
21 interpretations, the court must uphold the ALJ's findings if they
22 are based on substantial evidence.   Id.   Here, the ALJ properly
23 weighed the opinion of examining psychologist Banafshe Ardebili
24 and posed complete hypotheticals, supported by medical evidence,
25 to the VE.
26 //
27 //
28 //

1    Where the ALJ's findings are supported by substantial evidence,

2    the Court may not substitute its own judgment for that of the

3    Commissioner.  <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten</u>, 44

4    F.3d at 1457).  Consequently, the decision of the ALJ must be

5    affirmed.

6

7                               **VIII.**

8                            **CONCLUSION**

9

10        Consistent with the foregoing, it is ORDERED that the

11   Judgment be entered AFFIRMING the decision of the Commissioner.

12   The Clerk of the Court shall serve copies of this order and the

13   Judgment on counsel for both parties.

14

15   DATED:  September 3, 2015

16

17                              _____/S/_____
                                SUZANNE H. SEGAL
18                              UNITED STATES MAGISTRATE JUDGE

19

20   **THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW
     OR ANY OTHER LEGAL DATABASE.**

21

22

23

24

25

26

27

28